UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KENNETH HORTON,
          *Plaintiff*,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of the *Social Security*
*Administration*,
          *Defendant*.

Civil No. 1:18-cv-01331-TSE-MSN

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 11 and 13). Plaintiff Kenneth Horton seeks judicial review of the final decision of defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, denying his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). Alternatively, plaintiff moves for an order remanding the instant appeal to the Social Security Administration ("SSA") for a new administrative hearing pursuant to § 405(g). For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 11) be DENIED, defendant's Cross-Motion for Summary Judgment (Dkt. No. 13) be GRANTED, and defendant's final decision be AFFIRMED.

### I.     Background

Plaintiff applied for disability insurance benefits on May 17, 2014 alleging disability beginning July 20, 2013. Administrative Record ("AR") at 17. Plaintiff alleged the following disabilities: cervical disc disease disorder; osteoarthritis in his entire body; total disc disease

disorder in his entire body; and depression. *Id.* at 72.

Plaintiff's application was initially denied on August 19, 2014, and again upon reconsideration on January 9, 2015. *Id.* At plaintiff's request, a hearing was held on January 5, 2017 before Administrative Law Judge ("ALJ") Michael A. Krasnow in Washington, D.C. *Id.* at 38-71. Both plaintiff, represented by an attorney, and a Vocational Expert ("VE") testified. *Id.* On March 28, 2017, the ALJ issued a decision finding that plaintiff was not disabled under the Act from July 20, 2013 through March 28, 2017. *Id.* at 14-37. On March 28, 2018, the Appeals Council for the Office of Disability and Adjudication granted plaintiff's request for further administrative review and adopted the ALJ's findings and conclusions on August 30, 2018. *Id.*

Having exhausted his administrative remedies, plaintiff filed a Complaint (Dkt. No. 1) on October 26, 2018 challenging the ALJ's decision. Plaintiff filed a Motion for Summary Judgment (Dkt. No. 11) on January 29, 2019, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 12), to which the Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 13) on February 12, 2019, along with a Memorandum in Support of Defendant's Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment (Dkt. Nos. 14 and 15). Accordingly, the parties' motions are ripe for disposition.

## II.    Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ, medical evidence of plaintiff's physical and mental impairments, and state agency opinion evidence.

### a.  Plaintiff's Testimony at the Administrative Hearing

At the hearing on January 5, 2017, plaintiff testified that he was 34 years old, married, and living with his wife in an apartment building. AR at 41-42. He completed high school and two years of college, receiving an associate's degree in science, but did not attend any special education

classes or complete any type of specialized job training, trade, or vocational school. *Id.* at 43, 213. Plaintiff previously held the following positions: customer service representative from November 2012 to July 2013 (Macy's); auditor from April 2010 to February 2012 (Walmart); and supervisor from March 2003 to July 2009 (Ripley's Entertainment). *See id.* at 213. Plaintiff left his job at Macy's in July 2013 because he "was unable to perform due to medical reasons." *Id.* at 43. Specifically, plaintiff's degenerative disc disease made it hard for him "to pick up things" and "bright lights would trigger" his migraines. *Id.* At Walmart, he was an inventory control manager where he would handle inventory. *Id.* at 43-44. At Ripley's Entertainment, he was the manager of a Dippin' Dots, where he was the cashier and cook, among other things. *Id.* Plaintiff said that he has applied for jobs since his onset date of July 2013, but he has been turned down due to his health and his record of being unreliable. *Id.* at 45-46. Plaintiff has also not applied for any volunteer jobs since that date. *Id.* at 46.

Plaintiff testified that he was taking online classes at Strayer University to receive a bachelor's degree in accounting. *Id.* at 52. He began as a full-time student, participating in class about five times per week for approximately "30 minutes to four hours" in front of a computer. *Id.* at 54.  In Spring 2015, he dropped to part-time status due to health issues. *Id.* at 52. Specifically, plaintiff had many appointments, would "get very tired," and was "unable to concentrate, read, keep up with the chapters, discussions, [and] write papers." *Id.* at 53. Since 2015, he takes one class per semester and, as of the date of the hearing, had almost completed his degree and maintained a 3.0 GPA. *Id.* at 52-53.

Plaintiff testified that he can take a bath and dress himself, but his wife takes care of cooking and cleaning. *Id.* at 56. He likes to play with Legos, has an interest in history, and collects rare pieces of Waterford and Faberge eggs. *Id.* at 57. Plaintiff spends four to six hours a day on the

computer. He loves word searches and reads books, and is also a member of the Kennedy Center and Hillwood Estate, where he will go to one or two shows a year. *Id.* at 57. Plaintiff's last trip was to the Caribbean for his three-year anniversary in May 2016. *Id.* at 58.

Plaintiff further testified regarding his various physical impairments. First, with respect to his neck, plaintiff testified that he has disc degeneration. *Id.* at 46. He broke two discs at different times in his cervical spine and recently had an MRI, which found that he has a bulging disc in his mid-back, likely requiring additional surgery. *Id.* His nurse told him that he is not allowed to lift more than 15 pounds to avoid disc collapse and that he cannot walk more than a quarter of a mile per day without a cane. *Id.* at 47-48, 51. Second, plaintiff testified that his Stickler Syndrome "destroyed the laxity in [his] joints and [his] muscles," which makes his discs bulge and his knees unsteady. *Id.* at 49. He can stand for about 30 minutes or he can sit for an hour before needing to change positions. *Id.* Third, plaintiff stated that he has migraines at least once or twice a week, which last about five to six hours, and has had migraines since he was 15 years old. *Id.* at 54-55. While working at Ripley's, his boss would let him go home when he had a migraine and find a replacement, but he could not do so at Walmart or Macy's. *Id.* at 55. Lastly, plaintiff stated that although he has been diagnosed with carpal tunnel, he does not seek any treatment. *Id.* at 55-56.

To manage his physical pain, plaintiff testified that he takes the highest allowed dose of Norco, a pain medication, every six to eight hours each day. *Id.* at 49. Additionally, plaintiff takes Valium for spasms, Gabapentin for migraines, and Alfuzosin for bladder issues. *Id.* Plaintiff also sees a therapist or psychiatrist once a month, who prescribes him Effexor, Venlafaxine, Trazadone, and Buspirone, which address his insomnia and anxiety. *Id.* at 50. Plaintiff stated that on a scale of zero to ten, with ten being "the pain is so bad [he] has to go to the hospital emergency room," he feels about a seven on an average day, with medication. *Id.* at 60. He further testified that he

must lay down approximately three to four times a day, for about 30 minutes, due to his medication. *Id.* at 60-61. Within the past three years, plaintiff stated that his migraines and carpel tunnel have gotten worse. *Id.* In sum, plaintiff "feel[s] pain everywhere from [his] little toes to the brain." *Id.*

The ALJ posed the following hypotheticals for the VE to consider. The hypothetical person has plaintiff's same age, education, and past jobs; can perform the full range of light work except can frequently balance, stoop, kneel, crouch and crawl, and can occasionally climb ramps and stairs, but never climb ropes, ladders, or scaffolds; is limited to occasional reaching overhead with the left upper extremity; has to avoid concentrated exposure to hazards including dangerous machinery, unprotected heights and parts; can have no rate of pace of work; and can tolerate no more than frequent interaction with the general public. *Id.* at 65. First, the ALJ asked the VE if this person would be able to perform plaintiff's past work. *Id.* The VE responded that this person could not perform plaintiff's past work due to the "rate of pace" aspect because the person would have to be able to operate at a fast pace during the busy times of the job. *Id.* at 65-66. Second, the ALJ asked if there are other jobs that this person could perform. *Id.* The VE stated that the person could perform the following positions that are at the light, unskilled level: router; non-postal mail clerk; and officer help. *Id.* The VE further stated that the person could perform the following positions that are at the sedentary, unskilled level: addresser; document preparer; and surveillance system monitor. *Id.* at 66.

Next, the ALJ asked the VE to consider the same hypothetical person, except that the person could only occasionally balance, stoop, kneel, crouch, and crawl. *Id.* at 67. First, the ALJ asked whether any of the jobs would still remain for that person. *Id.* The VE stated that all jobs would remain. *Id.* The ALJ then asked if the person was further limited to frequent handling bilaterally, which of the jobs would still remain. *Id.* The VE responded that all jobs would remain.

*Id.* The ALJ further asked if the person was further limited to simple, routine, and repetitive tasks, which of those jobs would still remain. *Id*. Again, the VE said that all jobs would remain. *Id.* Lastly, the ALJ asked if there were any jobs for an individual that could only perform light or sedentary work and could not lift anything great than 15 pounds. *Id.* at 69. The VE said that all jobs would remain but clarified that not every position would be available for a person who could not lift over 15 pounds. *Id.* 69-70.

Plaintiff's counsel then asked the VE what level of absenteeism is tolerated for a hypothetical person to still be able to maintain employment. *Id.* The VE responded that if the person is missing two or more days a month they will not be able to maintain work, regardless if it were for doctor's appointments. *Id.* at 68-69.

### b. Medical Evidence of Alleged Physical Impairments

Plaintiff testified to having migraines since he was 15 years old, AR at 55, 1328-31; however, an MRI of his brain in June 2013 was "unremarkable," *id.* at 1331. Plaintiff sought treatment for his migraines three times during the relevant period, in June 2014, January 2015, and February 2015. *Id.* at 652-53, 1193-96, 1211, 1328. At those appointments, plaintiff stated that his migraines were "associated with photophobia, phonophobia, nausea, vomiting but no dizziness, blurry vision, paresis, paresthesias" and that his pain was "severe." *Id.* at 652. He further stated that his migraines were triggered by "family stress [and] lack of sleep." *Id.* His migraines occurred once or twice a month and lasted about eight hours. *Id.* Treatment notes indicated that Neurontin reduced his migraines and he was told to also try peppermint oil to reduce symptoms, which he failed to do. *See, e.g.*, *id.* at 1328.

With respect to plaintiff's Stickler Syndrome, treatment records from 2014 to 2016 showed no significant musculoskeletal or neurological problems. *Id.* at 1317-20. During a follow-up

appointment in November 2015, objective findings revealed no evidence of trigger points and plaintiff had a normal range of motion in his hands, wrists, shoulders, ankles, and feet with no effusion or tenderness. At another follow-up appointment in January 2016, plaintiff reported that he was "[d]oing well," *id.* at 1542, and an appointment the next month revealed that he had normal gait and posture as well as a normal neurologic evaluation, *id.* at 1554. Objective findings further revealed a normal range of motion in his arms and legs and no evidence of trigger points.

For plaintiff's musculoskeletal symptoms, an x-ray of his cervical spine in January 2014 exhibited multilevel degenerative disc disease but no "significant central canal or foraminal stenosis." *Id.* at 402. From January to June 2014, plaintiff visited the National Spine & Pain Center for neck pain. *Id.* at 383-401. During those visits, he received medication for muscle spasms and flares and had epidural steroid injections for comprehensive pain management. *Id.* at 385, 389, 392, 395, 398. Although plaintiff had a limited cervical range of motion, he also had 5/5 strength in bilateral upper extremities, a good grip strength, intact coordination and sensation, and negative Spurling's and Hoffman's bilaterally test. *Id.*

Plaintiff had a nerve conduction study in June 2014 and the results were normal. *Id.* at 431. By December 2014, an MRI revealed mild to moderate levoscoliosis and mild degenerative changes and disc protrusions. *Id.* at 920. Plaintiff was discharged from physical therapy in February 2015 because he missed appointments and failed to return to therapy for over thirty days. *Id.* at 898. Moreover, follow-up records from the National Spine & Pain Center from January to June 2015 indicated that his symptoms were stable on opioid medication without any medication changes. *See generally id.* at 933-76; *see, e.g.*, *id.* at 933 ("[Plaintiff] reports continued analgesia and improvement in functionality without adverse side effects."). Moreover, treatment notes during this time also showed that plaintiff had intact muscle strength in all extremities, an intact

neurological evaluation (including being alert and oriented with no impairment to his recent or remote memory), and a normal gait and normal posture, *see generally id.* at 1087-1254, and that the condition could be mitigated by rest and pain medication, *see id.* at 383, 387, 393, 933, 938, 943, 952, 1158, 1463. An MRI in December 2015 demonstrated degenerative and post-surgical changes. *Id.* at 1323-26.

Follow-up treatment notes from the National Spine & Pain Center from August 2015 to March 2016 showed that plaintiff maintained a normal gait and posture and an intact neurologic evaluation despite complaints of neck, back, and bilateral knee pain. *See, id.* at 1451-1517. In July 2016, plaintiff underwent a C5-6 cervical discectomy. *Id.* at 2086. After the surgery, discharge documentation noted restrictions on bending, lifting, and twisting, *id.* at 1696, 1699, and post-operative notes further revealed that plaintiff had no instability with flexion extension, *id.* at 2069. An MRI of plaintiff's cervical spine performed in November 2016 demonstrated evidence of the prior fusion and stable "mild" degenerative changes. *Id.* at 2344. In a letter dated January 3, 2017, Kaitlyn Bethune, N.P., stated that plaintiff was currently under her care for chronic pain and she recommended that plaintiff "does not lift anything greater than 15 pounds." *Id.* at 2345.

With respect to plaintiff's left shoulder, he visited the George Washington University Medical Faculty Associates from May 2014 to December 2014, and for follow-up appointments in February, July, and August 2015, as well as February 2016. During those appointments, despite some weakness in his left shoulder, he had normal sensation and a full range of motion. *See, e.g.*, *id.* at 439-41, 539-41, 543-45, 623-63, 686-96, 710-13, 869-90, 910-17, 1194, 1328, 1398, 1402, 1426-29. Plaintiff also had normal gait, normal station, full range of motion, normal muscle strength, normal muscle tone, intact sensation, and intact reflexes. *Id.* For example, an MRI of plaintiff's left shoulder in June 2014 showed that the "left shoulder AP and internal and external

rotation and axillary views are normal. There is no fracture, dislocation or arthritis anywhere. X-rays look perfect." *Id.* at 514.

Although plaintiff was diagnosed with bilateral carpal tunnel syndrome, *see id.* at 535, the record did not reflect any significant limitations resulting from those conditions, nor did plaintiff receive treatment or medication for the condition. *See id.* at 635, 707, 914, 1216, 1329. Nerve conduction studies also did not show carpal tunnel syndrome. *Id.* at 431-32, 1250-51.

### c. Medical Evidence of Alleged Mental Impairments

The medical evidence in the record reflects evidence of intermittent formal mental health treatment. Plaintiff reported suffering from depression and has been prescribed Trazadone and Effexor. AR at 352, 358, 362. Plaintiff's depression was diagnosed as in remission, which suggests that the medications helped with his condition. *Id.* at 316.

Plaintiff received mental health treatment from psychiatrist Betsy Jane Cooper, M.D., throughout the relevant time period. Treatment with Dr. Cooper was sporadic in 2012 and in 2013: treatment notes from October 2012 reflected that plaintiff thought he was "nuts," *id.* at 337; however, notes from September 2013 reflected that he was doing "wonderful," *id.* at 353. Plaintiff continued to have sporadic treatment with Dr. Cooper throughout 2014 to 2015. *See, e.g.*, *id.* at 828-31, 835-36, 839-40, 849-50, 862. In August 2014, Dr. Cooper prepared a mental status assessment, observing plaintiff to be "alert; oriented to person, place, date [and] time." *Id.* at 526. The assessment further noted that plaintiff appeared to be "aware of [his] emotional state(s)," which "do not appear [to be] robust or intense." *Id.* Dr. Cooper diagnosed plaintiff with major depressive disorder in remission, dental disease, arthritis, and erectile dysfunction, and only recommended therapy. *Id.* at 527.

9

In December 2016, Dr. Cooper prepared a Medical Source Statement explaining that plaintiff had chronic depression and that "at a vocational level[,] this implies that his ability to perform neurocognitive intensive work is impaired." *Id.* at 2334. Specifically, Dr. Cooper found that plaintiff is moderately impaired in his ability to understand, remember and carry out complex instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond to customary work pressures. *Id.* at 2333. Dr. Cooper further found that plaintiff was mildly impaired in his ability to understand, remember and carry out repetitive tasks; to sustain a routine without special supervision; to make simple work-related decisions; to respond appropriately to supervision; to respond appropriately to changes in the work setting; and to be aware of normal hazards and take appropriate precautions. *Id.* at 2333-34.

Lastly, plaintiff was routinely observed to have normal moods and memory. *See, e.g.*, *id.* at 434 (describing his mental status as "alert"); *id.* at 633 (describing his mental status as "normal"); *id.* at 1298 (stating that his judgment/sight was "within normal limits," his memory was "within normal limits for recent and remote events," and there was "no evidence of depression, anxiety or agitation").

### d.  State Opinion Evidence

With respect to physical impairments, on August 6, 2014, state agency physician Harold Ramsey, M.D., stated that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull an unlimited amount. AR at 80-82.

Additionally, Dr. Ramsey found that plaintiff had limited overhead reaching on his left side due to occasional pain, and that plaintiff could occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch, and crawl, and never climb ladders, ropes, and scaffolds. *Id.* at 81.

With regards to mental impairments, in August 2014 and January 2015, state agency psychologists Junko McWilliams, Ph.D., and Hilel Raclaw, Ph.D., each stated that plaintiff had mild restrictions in activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. *Id.* at 78-79, 95. Dr. McWilliams and Dr. Raclaw further stated that plaintiff could perform simple mental demands of competitive work and consistently carry out up to three-step instructions. *Id.* at 83, 97.

## II.    Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of

work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC, meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### a. The ALJ's Decision

On March 28, 2017, the ALJ issued a decision finding plaintiff not disabled and denying his application for benefits. AR at 17. Under the first step, the ALJ found that plaintiff did not engage in any SGA from his alleged onset date of July 20, 2013. *Id.* at 19. At step two, the ALJ found that plaintiff had the following severe impairments: affective mood disorder; stickler syndrome; degenerative disc disease with radiculopathy status post fusion surgery; and osteoarthritis. *Id.* The ALJ further found that plaintiff's "hypertension, bilateral carpel tunnel syndrome, anxiety related disorder, ADHD, migraines, and bladder dysfunction" are non-severe impairments. *Id.* at 20. Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.*

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms, but determined that those statements were not consistent with the objective medical evidence and other evidence in the record. *Id.* at 23. After considering the entire record, the ALJ concluded that plaintiff has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except that he can occasionally reach overhead with the left upper extremity. *Id.* at 22. The ALJ further found that plaintiff "must avoid concentrated exposure to hazards, including moving machinery and unprotected heights," that he can perform "no productive rate of pace

12

work," that he can have "frequent interaction with the general public," that he can "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl," that he can never "climb ropes, ladders, or scaffolds," and that he is limited to simple, routine, and repetitive tasks. *Id.*

Under step four, the ALJ found that plaintiff is unable to perform his past relevant work as an inventory control manager and restaurant manager. *Id.* at 28. The ALJ found that the VE testified that a hypothetical individual with the same age, education, and work experience as plaintiff, given the RFC, "could not perform the claimant's past work." *Id.* However, under step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that claimant can perform." *Id.* at 29. Relying on the VE's testimony, the ALJ concluded that plaintiff could perform the following jobs: router; non-postal mail clerk; and office helper. *Id.* Based on the foregoing analysis, the ALJ concluded that plaintiff was not disabled as defined by the Act. *Id.* at 30.

### b.  The Appeals Council Decision

On March 28, 2018, the Appeals Council granted plaintiff's request to review the ALJ's decision. AR at 4. The Appeals Council adopted the ALJ's findings and conclusions regarding whether plaintiff is disabled. *Id.* However, the Appeals Council concluded that the ALJ "did not discuss or assign weight to a medical source statement from Kaitlyn Bethune, N.P.," and that the Appeals Council assigns great weight to her opinion. *Id.* at 5. The Appeals Council added the additional limitation to plaintiff's RFC that he "cannot lift anything greater than 15 pounds…." *Id.* at 6. Despite this additional limitation, the Appeals Council adopted the ALJ's findings that plaintiff could perform the following occupations: router; non-postal mail clerk; and officer helper, hospital. *Id.*

### III.      Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is

14

"overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

## IV.    Analysis

Plaintiff argues that the ALJ erroneously (1) assessed his RFC and (2) evaluated his subjective complaints. Pl. Br. (Dkt. No. 12) 4-11. Defendant moves for summary judgment on the basis that the ALJ's decision is supported by substantial evidence in the record. Def. Br. (Dkt. No. 14) 14-26. For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Cross-Motion for Summary Judgment, and affirming the ALJ's decision.

### a.    RFC Assessment

Plaintiff argues that the ALJ erroneously assessed his RFC by failing to properly perform a function-by-function assessment. Pl. Br. (Dkt. No. 12) 4. Specifically, plaintiff argues that the ALJ (1) failed to adequately address his migraines, (2) failed to provide an explanation to support the finding that plaintiff possessed the RFC to perform light work with occasional overhead reaching with the left upper extremity, and (3) erroneously evaluated the state agency physicians' opinions. *Id.* at 6-11.  Each of these arguments is addressed in turn below.

### i.   Migraines

Plaintiff first argues that the ALJ failed to properly consider the frequency and duration of hi migraines when determining they were not a severe impairment and when calculating his RFC. Pl. Br. (Dkt. No. 12) at 6-8. Plaintiff argues that this is "particularly significant as there is no evidence that the degree of absenteeism necessitated by the frequency of [his] migraine headaches would be tolerated by employers in the national economy" and because the ALJ did not discredit his testimony. *Id.* at 8.

In support of his argument, plaintiff relies on *Fetter v. Commissioner*, 2016 WL 3646850 (D. Md. July 7, 2016), where the ALJ found that plaintiff's migraines were a severe impairment but did not include any limitations in his RFC assessment to prevent migraines or to eliminate triggers. *Id.* at *3. The district court found that the ALJ's failure to articulate why he did not include such limitations was grounds for a remand. *Id.* Plaintiff also relies on *Muir v. Astrue*, 2013 WL 140779 (D. Md. Jan. 3, 2013), where the ALJ also concluded that plaintiff's migraines were a severe impairment but failed to explain his conclusion that "the claimant's migraine headaches would not prevent him from performing a full range of sedentary work on a sustained basis." *Id.* at *9. *See also Laroche v. Berryhill*, 2018 WL 1243545, at *6 (D. Md. Mar. 9, 2018) (remanding the case because although ALJ found that plaintiff's migraines were a severe impairment, the ALJ failed to create an "accurate and logical bridge" between the evidence in the record and the ALJ's conclusions); *Thrower v. Colvin*, 2016 WL 4734355, at *4 (E.D. N.C. June 23, 2016) ("These errors—failing to discuss [the plaintiff's] migraine headaches [,which qualified as a severe impairment,] and failing to explain the reason for crediting some of the State agency consultants' findings and not others—'frustrate[ ] meaningful review' by the court and warrant remand.").

16

Unlike the ALJs in *Fetter*, *Muir*, *Laroche*, and *Thrower*, here, the ALJ did not find that plaintiff's migraines were a severe impairment based on the evidence in the record. Though plaintiff has had migraines since he was 15 years old, the ALJ noted that the "migraines are managed with Neurotin, and a[n] MRI of his brain has been unremarkable." AR at 19. Moreover, the ALJ's RFC calculation relied on plaintiff's testimony that the frequency and duration of his migraines essentially remained the same as when he was working at SGA levels, demonstrating that the migraines were not work preclusive. *Id.* at 26. Tellingly, plaintiff did not even allege migraines as a basis for disability in his application on May 7, 2014. *See id.* at 72.[1]

Contrary to plaintiff's argument, the record supports the ALJ's conclusion. Plaintiff has had migraines since he was 15 years old, but only sought treatment three times in June 2014, January 2015, and February 2015. *Id.* at 652-53, 1193-96, 1211, 1328. Treatment notes from June 2014 indicated that plaintiff's pain from his migraines was "severe" but that he "prefer[ed] to sleep, take medication (well controlled on Gabapentin), [and] work through the pain to relieve [his] headache." *Id.* at 652. Treatment notes from February 2015 indicated that Neurontin reduced his migraines and he was told to try conservative treatment of peppermint oil, but never did so. *See, e.g.*, *id.* at 1193, 1328. Also, an MRI of his brain in June 2013 was "unremarkable." *Id.* at 1331.

During this time, plaintiff was able to maintain work and receive a higher education. Although plaintiff had migraines since he was a teenager, he was able to maintain steady

---

[1] A plaintiff must prove that he has a "severe impairment . . . or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Under the Act, a severe impairment must cause more than a minimal effect on the plaintiff's ability to function. *Id.* An impairment "is not severe if it does not significantly limit [a plaintiff's] physical or mental ability to do basic work activities or last or be expected to last for a continuous period of at least 12 months." *Id.* at §§ 404.1509, 404.1521(a), 416.909, 416.921(a). The plaintiff has the burden of demonstrating that his impairment is severe. *See Bowen v. Yuckert*, 428 U.S. 137, 146 (1987). If the plaintiff "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§§ 404.1509 and § 416.909], or a combination of impairments that is severe and meets the duration requirement[,]" the ALJ must find that he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

employment from 2003 to 2013. *Id.* at 43. Plaintiff also testified that he was taking college courses to obtain a bachelor's degree in accounting, maintaining a 3.0 GPA, and using a computer for six to seven hours a day. *Id.* at 21. Although plaintiff testified that his migraines have worsened over the past several years, he failed to state any additional physical limitations. *Id.* at 61. Nor did plaintiff present any evidence that his migraines would necessitate two or more days per month of missed work. Accordingly, the ALJ's finding that plaintiff's migraines did not limit his ability to do basic work activities is supported by his testimony as well as other medical evidence in the record.

### ii. RFC to Perform Light Work with Occasional Overhead Reaching with the Left Upper Extremity

Second, plaintiff argues that the ALJ failed to set forth a "narrative discussion" to support his finding that plaintiff possessed the RFC to perform light work with only occasional overhead reaching with the left upper extremity. Pl. Br. (Dkt. No. 12) 9. Specifically, plaintiff argues that the ALJ failed to account for the following when calculating his RFC: that plaintiff has frequent migraines; has been diagnosed with cervical radiculopathy and post-fusion; has had an abnormal EMG of the upper left extremity; has been diagnosed with hypermobility syndrome (which adds to his back pain); has significant weakness in his left shoulder; and has been diagnosed with suprascapular nerve neupraxia. *Id.* at 9-10.

The Fourth Circuit has held that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (internal citations omitted); *see also Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016). The *Mascio* standard is satisfied if the ALJ (1) fashions an appropriately limited RFC or (2) performs a function-by-function analysis that explains, either

explicitly or implicitly, why additional limitations are not necessary. *See Oldham v. Berryhill*, 2018 WL 773442, at *8 (E.D. Va. Jan. 17, 2018).

Like other aspects of the disability evaluation process, an ALJ's RFC determination is subject to the "substantial evidence" standard of review. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Monroe*, 826 F.3d at 189 (citing *Radford v. Colvin*, 734 F.2d 288, 295 (4th Cir. 2013)). In assessing a plaintiff's RFC, an ALJ must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (citing *Masico*, 780 F.3d at 636)). The ALJ must identify evidence that supports his conclusions and "build an accurate and logical bridge from [that] evidence to his conclusion." *Id.* (citing *Monroe*, 826 F.3d at 189).

For example, in *Woods*, the ALJ concluded that the plaintiff could perform "medium work" and summarized the evidence that he found credible, useful, and consistent; however, the ALJ never explained how he concluded—*based on this evidence*—that the plaintiff could perform the tasks required by "medium work," such as lifting up to 50 pounds at a time, frequently lifting or carrying up to 25 pounds, or standing or walking for six hours. *Id.* Accordingly, the Fourth Circuit found that the "ALJ [] failed to build an 'accurate and logical bridge' from the evidence he recounted to his conclusion about [the plaintiffs' RFC.]" *Id.*

Unlike the ALJ in *Woods*, the ALJ discussed plaintiff's functional limitations resulting from his severe and non-severe impairments based on evidence in the record, and created an RFC that accounted for such limitations. The ALJ found that plaintiff has the ability to perform "light

work" as defined by 20 C.F.R. § 404.1567(b) as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," as well as a "good deal" of walking or standing and some "pushing and pulling of arm or leg controls." *See also supra* Section II. a. In so finding, the ALJ referred to the medical evidence in the record that plaintiff has constant pain in his ankles, shoulders, back, neck, knees, and hands, and that such pain prohibits him from lifting more than 20 pounds.[2] AR at 23. The ALJ further found that all of plaintiff's conditions have worsened and that he has "difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and seeing, as well as with his memory," and that plaintiff is only "able to walk about 30 to 45 minutes before needing to rest." *Id.*; *see also id.* at 242. The ALJ also relied on plaintiff's testimony that he uses an elevator to get up to his apartment; he is right-hand dominant; he stopped working due to medical reasons; he has difficulty picking up things because of his degenerative disc disease; he uses a neck brace to keep his neck straight; he is not supposed to lift over 15 pounds; and he needs to use a cane. *Id.* Because of plaintiff's symptoms, plaintiff is only able to walk quarter of a mile, stand for 30 minutes, and sit for 60 minutes before he needs to change positions. *Id.* at 23.

By simply pointing to various diagnoses, including musculoskeletal symptoms and weakness in his left shoulder, plaintiff argues that the ALJ failed to consider the functional limitations resulting from such diagnoses when calculating his RFC; however, plaintiff failed to identify any additional functional limitations resulting from these diagnoses that the ALJ failed to consider. "[E]vidence of a diagnosis alone is insufficient to establish disability . . . Rather the functional limitations produced by the diagnosis are the focus of the disability inquiry." *Cobb v. Colvin*, 2016 WL 8199316, at *4 (E.D. Va. Mar. 3, 2016).  Contrary to plaintiff's arguments, the

---

[2]     The Appeals Council found an additional limitation to plaintiff's RFC that he "cannot lift anything greater than 15 pounds." AR at 6. Despite this additional limitation, the Appeals Council adopted the ALJ's findings. *Id.*

ALJ explained that he did not factor in plaintiff's other diagnoses when calculating his RFC because they were inconsistent with the other medical evidence in the record.[3]

The ALJ did not account for plaintiff's musculoskeletal symptoms—which include those arising from his claims of cervical radiculopathy, abnormal EMG of the left upper extremity, hypermobility syndrome, and suprascapular nerve neuprax—because his examination findings were generally normal. *Id.* at 23. From January to June 2014, plaintiff visited the National Spine & Pain Center for his neck pain and, at those appointments, plaintiff had generally normal strength. *See id.* at 384 (finding that plaintiff generally had a 5/5 strength in bilateral upper extremities, a good grip strength, a negative Spurling's and Hoffman's bilaterally test, and his coordination and sensation were intact). Similarly, follow-up records from January to June 2015 indicated that his symptoms were stable on opioid medication without any medication changes. *See generally id.* at 933-76. Treatment notes during this time period also showed that he had intact muscle strength in all extremities, an intact neurologic evaluation, and a normal gait and normal posture, *see generally id.* at 1087-1254, and that his conditions could be mitigated by rest and pain medication, *see id.* at 383, 387, 393, 933, 938, 943, 952, 1158, 1463. Additionally, plaintiff's MRIs in December 2014, December 2015, and November 2016 were generally normal. *Id.* at 920, 1323-26, 2344. Lastly, plaintiff had a nerve condition study in June 2014 and the results were "an essentially normal study." *Id.* at 24. Based on these findings, the ALJ properly concluded that his symptoms did not limit him as he alleged and were not disabling. *Id.* at 24.

The ALJ also addressed plaintiff's limitations with respect to his left shoulder in his RFC assessment by limiting plaintiff to "occasionally reach[ing] overhead with the left upper extremity." *Id.* at 22. From May to December 2014 and February, July, and August 2015, plaintiff

---

[3]     Plaintiff argues that the ALJ failed to take into account his migraines when calculating his RFC; however, the Court has already extensively addressed this argument. *See supra* Section IV. a. i.

visited the George Washington University Medical Faculty Associates. Despite some weakness in his left shoulder, plaintiff had normal sensation and a full range of motion in his shoulder. *See, e.g.*, *id.* at 439-41, 539-41, 543-45, 623-63, 686-96, 710-13, 869-90, 910-17, 1194, 1328, 1398, 1402, 1426-29. During these appointments, plaintiff also had normal gait, normal station, full range of motion, normal muscle strength, normal muscle tone, intact sensation, and intact reflexes. *Id.* Moreover, an MRI in June 2014 was "perfect." *Id.* at 514.

Accordingly, there is substantial evidence in the record to support the ALJ's calculation of plaintiff's RFC that he can perform light work with occasional overhead reaching with the upper left extremity, as well as why he did not account for plaintiff's other diagnoses when making this RFC determination.

### iii.      State Agency Physicians' Opinions

Lastly, plaintiff claims that the ALJ erroneously evaluated the opinions of the state agency physicians by failing to consider that they determined that plaintiff could "carry out up to the three-step instructions" and by failing to consider this limitation in his RFC. Pl. Br. (Dkt. No. 12) 10.

The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints, objective medical evidence, and medical source opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011). Moreover, this circuit has recognized that an ALJ is entitled to rely on the opinion of a reviewing physician or psychologist when it is consistent with the other evidence in the record. *See, e.g.*, *Johnson v. Barnhart*, 434 F.3d 650, 656-57 (4th Cir. 2005) (finding that substantial evidence "supports the ALJ's reliance on Dr. Starr's opinion" because his opinion was consistent with other doctors' opinions). It is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c).

The ALJ found the state agency physicians to be highly qualified and knowledgeable, but afforded them only partial weight because they "did not have the benefit of evidence received at the hearing level." AR at 27. Specifically, the state agency physicians opined that plaintiff had mild restrictions in daily living and maintaining social functioning, concentration, persistence, or pace, but that he could perform the simple mental demands of competitive work and "carry out up to three step instructions consistently." *Id.* The ALJ found that the physicians used the wrong criteria, and that the record actually supports that plaintiff can manage and perform his own daily activities and had not displayed any difficulty interacting with others. *Id.*

With respect to plaintiff's ability to perform simple mental demands of competitive work, the ALJ afforded plaintiff *greater* limitations than the state agency physicians by limiting plaintiff "to simple tasks, consistent with his ability to take college courses, and provides social limitations, in consideration of [plaintiff's] allegations that people stress him out." *Id.* This conclusion not only takes into account the state agency physicians' opinions, but also the additional psychological objective findings of normal mood and intact memory. *See, e.g.*, *id.* at 434, 437, 445, 450 454, 460 (describing mood and affect as normal); *id.* at 558 (finding plaintiff's memory "within limits for recent and remote events" and his mood and affect as "no evidence of depression, anxiety or agitation"); *id.* at 524 (Dr. Cooper prepared a mental status assessment observing plaintiff to be "alert; oriented to person, place, date [and] time.").

Moreover, even if the ALJ had explicitly included a limitation of the "three step instructions" in the RFC assessment, as opposed to simply requiring "simple tasks," the results would remain the same. Specifically, a limitation for a "three step instruction" would not prevent plaintiff from performing any of the representative jobs identified by the VE. The router and office

helper positions are classified as GED Reasoning Level 2,[4] which requires a claimant to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, Appendix C—Components of the Definition Trailer, 1991 WL 688702. Although a non-postal mail clerk position is classified as GED Reasoning Level 3—which requires the claimant to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations"—the VE confirmed that this position would still exist for a person who was "limited to simple, routine, repetitive tasks." *Id.* Accordingly, even if the ALJ had made an error by finding that plaintiff could perform simply tasks, such an error would be harmless. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016) (finding an ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant).

The Court may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) (providing that it is not the role of the court to try the case de novo when reviewing disability determinations). Therefore, the undersigned finds that the ALJ appropriately weighed the state agency physicians' opinions.

### b.    Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erroneously evaluated his subjective complaints by failing to explain why he discredited some of plaintiff's testimony. Pl. Br. (Dkt. No. 12) 11-13. Specifically,

---

[4]    For comparison purposes, a Reasoning Level 1 requires a claimant to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from theses situations encountered on the job." Dictionary of Occupational Titles, Appendix C—Components of the Definition Trailer, 1991 WL 688702.

plaintiff argues that substantial evidence in the record does not support the ALJ's findings regarding the extent of plaintiff's daily activities. *Id.*

An ALJ must apply a two-step process in considering a claimant's subjective symptoms to (1) evaluate whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms and (2) evaluate the intensity and persistence of an individual's symptoms, such as pain, to determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities. *See Williams v. Berryhill*, 2018 WL 851259, at *10 (E.D. Va. Jan. 18, 2019), *report and recommendation adopted*, 2018 WL 1164938 (E.D. Va. Feb. 12, 2018); *see also* SSR 16-13p, 2016 WL 1119029, at *3-4 (Mar. 16, 2016). An ALJ must then sufficiently articulate his or her analysis of subjective symptoms so "any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-13p, 2016 WL 1119029, at *9. In weighing subjective symptoms, the ALJ is required to consider a number of factors, such as the medical opinions, the consistency of the complaints with objective evidence, the frequency and extent of treatment sought, and daily activities. *Id.* at *3-4.

Here, the ALJ correctly applied the two-part process. First, the ALJ considered whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce plaintiff's pain or other symptoms. AR at 22. Second, the ALJ evaluated the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functional limitations, concluding that plaintiff's statements regarding symptoms were not entirely consistent with the record. *Id.* at 23. Plaintiff disputes the second step.

First, plaintiff argues that the ALJ failed to explain how he decided which of plaintiff's statements at the hearing to believe and which to discredit. In support, plaintiff relies on *Lewis v.*

*Berryhill*, 858 F.3d 858 (4th Cir. 2017) and *Mascio*, 780 F.3d 632 (4th Cir. 2015); however, neither

are applicable. In *Lewis*, the plaintiff argued that the ALJ improperly discounted her subjective

evidence of pain based solely on the lack of objective evidence of pain intensity. *Id.* at 866. The

circuit court agreed with the plaintiff and found that the ALJ failed to explain which of plaintiff's

statements weakened "her subjective evidence of pain intensity as limiting her functional

capacity." *Id.* Similarly, in *Masico*, the ALJ chose to credit some but not all of the plaintiff's

statements, and the circuit court found that "[n]owhere, however, does the ALJ explain how he

decided which of [the plaintiff's] statements to believe and which to discredit, other than the vague

(and circular) boilerplate statement that he did not believe any claims of limitations beyond what

he found when considering" the plaintiff's RFC. *Id.* at 640.

Here, unlike the ALJs at issue in *Lewis* and *Mascio*, the ALJ explained the inconsistency

in the evidence and plaintiff's testimony. Plaintiff testified that he is able to drive five times per

month, including driving to the disability hearing. AR at 26. Based on this representation, the ALJ

found that plaintiff was also able to "(1) maintain attention, concentration, and persistence; (2) use

hand and foot controls; (3) turn one's head and neck (*e.g.*, when reversing, parking, or changing

lanes); (4) move and position one's body in such a fashion so as to be able to get in and out of the

vehicle; and (5) deal with stress inherent in the operation of a motor vehicle," contrary to his

representations at the hearing. *Id.* Plaintiff further testified that he was unable to work since his

alleged onset date; however, he also stated that he applied for full- and part-time jobs after his

alleged onset date. *Id.* The ALJ found that this testimony demonstrates that plaintiff "represented

to a potential employer that he was ready, willing, and able to work on a full-time basis, and/or

that [he] believed that he was capable of working on such a basis." *Id.* Accordingly, the ALJ found

that this evidence demonstrates that plaintiff's current unemployed status may not reflect a

functional inability to do work, but "suggests that [he] has not yet been hired." *Id.* Plaintiff also testified that the frequency and duration of his migraines is essentially the same as when he performed SGA, which the ALJ found "demonstrates that this impairment is not work preclusive." *Id.* Lastly, plaintiff testified that he takes college courses online, meaning he is on his computer about six to seven hours a day. *Id.* The ALJ found that this testimony reflects that his "hand, wrist, and neck problems are not work preclusive or that limiting." *Id.* Additionally, because plaintiff testified that he is taking courses to obtain a bachelor's degree in accounting and has a 3.0 GPA, "his mental impairment is not work preclusive," which is further supported by the fact that plaintiff "plays with legos, collects Faberge eggs, and reads books about the Titanic and Lucille Ball, which suggests mental acuity." *Id.* at 26-27.

Second, plaintiff argues that the ALJ failed to fully consider the extent to which he could perform daily activities. Pl. Br. (Dkt. No. 12) 12. Specifically, plaintiff argues that the ALJ considered the types of activities plaintiff could allegedly perform without also considering the extent to which he could perform them, among other limitations. *Id.* at 12-13. Contrary to plaintiff's argument, and as stated above, the ALJ did account for such limitations. The ALJ considered that plaintiff has "pain in his ankles, shoulders, back, neck, knees, and hands every day and all day," that he is "unable to lift more than 20 pounds," that he cannot drive when taking pain medications, that "all of his conditions have worsened and that his wife takes care of all of his personal needs and does the household chores," that he has difficulty "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and seeing, as well as with his memory," and that he is only able to walk about "30 to 45 minutes before needing to rest." AR at 23. The ALJ's findings accounted for these limitations.

Moreover, the ALJ's discussion of plaintiff's normal examination findings, conservative

pain treatment, recovery from cervical discectomy, and plaintiff's activity level support his finding that plaintiff was not disabled. Accordingly, there is substantial evidence in the record to support the ALJ's evaluation of plaintiff's subjective complaints.

### V.    Recommendation

For the reasons set forth above, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 11) be DENIED, that defendant's Cross-Motion for Summary Judgment (Dkt. No. 13) be GRANTED, and that the final decision of defendant be AFFIRMED.

### VI.    Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

                                            /s/
                                        Michael S. Nachmanoff
                                        United States Magistrate Judge

May 17, 2019
Alexandria, Virginia